Good morning, Your Honors. May it please the Court, my name is Michelle Arrington, representing the appellant, the Federal Trade Commission, in this action. Your Honors, in the contempt proceeding below, the FTC introduced evidence, evidence that was not disputed by defendants' experts, and in many instances was even admitted to by defendants themselves, showing that in violation of consent orders entered in 2000, defendants made a number of claims in advertising certain products that are not substantiated by any scientific evidence, and in making those claims misrepresented the existence or contents of studies. The District Court ignored this undisputed evidence, however, and focused instead on competing expert testimony between the defendants' experts and the FTC's experts concerning what constituted competent and reliable scientific evidence as defined in the order. The problem with that is that that only addressed some of the claims that the FTC challenged in this contempt action, but even accepting their defendants, the defendants' experts' testimony regarding what amounted to competent and reliable scientific evidence, that left unaddressed numerous claims, and in particular with regard to AdvoCal, a calcium supplement that was not disputed by the defendants. What standard, what's the standard for contempt, and what standard should we use in reviewing Judge Kavanaugh's order? Well, Your Honor, the burden was on the Federal Trade Commission to show by clear and convincing evidence, which the FTC did. Now, in reviewing this, the standard... To show what? To show that they violated provisions of the order, and in this case, the provisions, the relevant provisions were paragraph three of the order, which... Disobeyed. Disobeyed, yes. That's not quite the same as violated. Okay, disobeyed. Disobeyed. Disobeyed, all right. What did Judge Kavanaugh hold with respect to the defendants' actions? That Judge Kavanaugh held that the FTC had failed to prove by clear and convincing evidence that the defendants disobeyed the relevant provisions paragraph three and four. You haven't told, you haven't answered my question, I think, which is... What is this? What standard do we use in reviewing Judge Kavanaugh's determination? Yes, Your Honor, that is an abuse of discretion. That is either an erroneous application of the law, or in the context of the facts, and in one of the cases that we cite, Roe v. Operation Rescue, it was ignoring undisputed evidence. So is there, was there, just go back to the question, was there any erroneous legal determination by Judge Kavanaugh? Yes, Your Honor, there was. And certainly with regard to the second half of Judge Kavanaugh's decision on substantial compliance, which rolled in a number of different issues together. But that was an alternative holding, correct? Well, that was, that was, yes, that was, that was an alternative holding, even if there were some violations, they were in substantial compliance. Let me follow up on Judge Slobodin's question, because it seems to me the proposition that you set forth in your brief, that we review denial of a, an adjudication of contempt under an abuse of discretion standard to be non-controversial. Let's go beyond that, however, and assuming we're reviewing the determination of substantial compliance, I'm curious as to whether we review substantial, the substantial compliance determination, and I couldn't find an answer to this, as a question of law, or as a question of fact? Well, Your Honor, we say that there was an error of law in the standard of substantial compliance. I don't think you said that, well, you haven't explicitly dealt with that in your brief. I don't think anybody has, and it frankly came to me as an afterthought, that the various findings of fact, constituent findings of fact necessary to ultimately get to that determination of substantial compliance, well known, they're findings of fact. But, but the ultimate determination is either an ultimate finding of fact, or it would seem to me to be a determina, a determination of law, a conclusion. Your Honor, in our brief, and I believe we said this in our brief, and perhaps not clearly enough, but in our brief, we argue a legal error in that, as this Court has, has applied, and in the Robin Woods versus Woods case, it, we, we, we didn't adopt it, did we? No, you didn't adopt it. We've, we've accepted that it's been recognized out there, we just kind of assumed it. We have yet to adopt this. That, that's correct, and, but certainly under that, that the legal standard, a two-pronged legal standard that was at least applied in that case, if not, if not expressly adopted. If that is the legal standard, then Judge Kavanaugh erred in applying it, because Well, we found that, and I quote, the defendants acted reasonably and appropriately in assuming they were in compliance, since they heard nothing to the contrary for years, six years. Now, that's a factual finding, isn't it? I mean, reasonableness is a paradigm factual inquiry. That is a factual finding, and the legal, the legal error part of it is that there is a second prong. If we adopt Robin Woods. If you were to adopt it, yes, that's exactly right. If we adopt the standard that Robin Woods essentially adopted, that requires a two-pronged. That, that's correct, but, but in a There you have to get to whether it's technical or inadvertent. Yes, that's correct, and in this case, again, the, the errors that, that we allege in, in the liability, the, the, the first inquiry as to whether there were, there were, whether the, the defendants disobeyed the, the relevant provisions of the consent orders, in ignoring the, the district court's failure to consider the full panoply of claims, including the claims as to which evidence was undisputed, that also infected the district courts. That error also infected the district court's determination that they substantially complied. Well, when you use the word ignore, I think we have to cut to the chase. Yes. Because I know I am very concerned about this. The defendants invoke with, with reason the February 2001 compliance report that they filed, and they urge on us to consider it and to consider the amounts of materials, including many of the ads at issue here, that were disclosed in February 2001. Your reply brief makes no mention, none, of the February 2001 compliance report. There's one reference at one page to generic compliance reports, and that's it. But the defendants heard nothing for you, from you for almost six years about the, what they had submitted. Why was it unreasonable for them to assume that they could continue in doing the things they had disclosed six years earlier? Well, Your Honor, in this particular case, one has to keep in mind that there was litigation brought by the FTC, which was, which was still pending, and was, that case was not decided until 2004, which, although involved not the same products, different products, but the types of claims that they were making and the type of practice, for example, on relying on, on so-called third-party literature, which, which made unsubstantiated claims. The consent orders were July 6th and September 26th, 2000. Yes, Your Honor, and in the, in the FDA litigation, they made, the defendants in this action made, a very similar argument as to, well, Your Honor, we submitted compliance reports to the FTC in 2001, and they haven't, they haven't taken any action, so we can presume that, that they, they, they've made the determination that there are no continuing violations of the FTC. Is that a reasonable conclusion for the defendants who have reached under these circumstances? Your Honor, in this case, it is not, in, given, given in the context of the F, the FDA litigation, when they raised the similar issue based on the FTC's inaction in the face of their submission of compliance reports, the FTC submitted a declaration, and the district court so held that the, the lack of immediate action by the FTC in receiving compliance reports was not to be considered to be a determination by the FTC that the advertising that, that defendants were made, and the claims that they were making about their products. Is that res judicata here? Yeah, I was just going to say, what are we, okay, so that's what the district court said. Yeah. But so what? But Your Honor, it goes to certainly the reasonableness of, of the defendants, of the defendants actions and, and. But suppose we don't agree with the district court that, and you said immediate, I think, didn't you put immediate in there that the, the FTC's failure to respond immediately, but this is not a question of responding immediately, it's a question of responding over a period of time. Why is it unreasonable? And certainly, I mean, even assume, let's assume the FTC doesn't have as many enforcers or viewers. Yes. That it would like. Yes. You haven't, you haven't made that argument. No. But I think we can assume that. Yes, I think you can assume that. So, but, but even so, this is a lengthy period of time, and did the FTC even write to them and say, hey, we're a little worried about this? The FTC did not write a letter saying we're worried about this. They continued to solicit additional information, and particularly in light of the, the, when the FDA litigation. And what period, when did they do that? When did they, what were the dates when the FTC wrote and said we would like additional information? I believe it was in 2004, and then, and then in 2006 immediately before it brought this action. They wrote, they wrote to Lane Labs. I believe they requested, they requested. I don't believe that in the record. It's, it's, I believe that the, that the, I believe that in the appendix for the, for the submission of compliance reports, it references, it references the FTC's request. Perhaps you can help me, Ms. Errington, because I don't know what the court did with this. Truly, to this point, I don't, I don't know. It, it, it seemed not to be ruling on this as a matter of latches, because it can't. It invoked fundamental fairness, and I don't know what that is in this context without a sight. Just what was it that the district court did with respect to this delay or this silence on the part of the FTC, and how does that play into the ultimate determination here apparently of substantial compliance ill known? I see that my red light is on. Can you answer? Yes. In fact, I may have a few other questions. Yes. It doesn't, the red light doesn't apply to the court. Yes. I know. I know that. I don't know, to be honest, where this fundamental fairness language comes from, and even, however, even though it was not strictly a latches defense in that it did not operate as a total bar, it nonetheless, it, it has been called different things, this type of argument that the government's delay, and in some instances longer delays than in this case, in, in telling defendants that their conduct is wrong and, and then bringing an enforcement action against that. The courts have uniformly held that those type of arguments, whether raised as estoppel arguments, latches, or at the Supreme Court's language that we quoted in our brief, just a general neglect of duty as a matter of law will not, will not save the defendants and will not preclude the government from, from proceeding on those claims. Yeah, but that, that may, that's true. Of course it's true, but isn't the district court entitled to take that into consideration when the issue before the district court is contempt, which requires a certain willfulness by the defendant? Your Honor, civil contempt, this court has, in Harley-Davidson, in, in, in the Robin Woods case as well, has made very clear that willfulness is not an element of civil contempt in good faith. All right, disobeyed the consent orders, you conceded and answered the first question that is one of the three things that must be found for a finding of civil contempt. Is not the fact that for almost six years the defendants heard nothing from the FTC following voluminous submissions a factor that the district court could consider in determining whether or not there had been a disobeyal, disobey, whether the defense had disobeyed the contempt orders? Well, Your Honor, I, I, I'm not sure that's relevant to the inquiry in looking at whether there are violations or, excuse me, disobeyance of affirmative obligations imposed by the consent orders that defendants are not to make claims about the effects or health benefits of their products unless they possess competent and reliable scientific evidence in support of those claims and not misrepresent the existence or contents of studies. Because they never heard from you. Your Honors, that, to, to, to, to hold that would fly in the face of clear case law that says. Ms. Arrington. Yes. I, I, Advocal is the only calcium that can increase bone density. Where is there support in the record for the district court's ultimate determination here? Because he really made no specific findings of fact with respect to specific violations. Yes. He made an overall determination of, of credibility. What does the record show with respect to, my opinion only, quite obviously, seems to be a very extravagant claim. Yes. Well, Your Honor. Well, who agrees? Right. Then the district court didn't address that. It didn't address the prescription drug equivalency claim. The, what's in the record on that is Andrew Lane, one of the defendants, testimony that what he meant by that, although he testified that, although what scientists mean when they say that a calcium. Is there any dispute that that is just flat out wrong? Yes, Your Honor. The evidence that that is flat out wrong comes from the testimony of both sides' experts. That was a softball. Yes. Well, I hope I answered that. Advocal is comparable or superior to prescription drugs to treat osteoporosis. And what did Mr. Lane testify to with respect to the justification for that claim? Mr. Lane did not testify that there was any substantiation. His expert did not testify that there was any substantiation. That relied entirely on their argument that they did not make that claim. They were not responsible. But they paid HSI to use that newsletter. They made some alterations to the newsletter by modifying the chart that specifically made that comparison. But the only way that they modified it was to take out the specific names of Avista and Fosamax. Thank you. Fosamax. Thank you. Your time is up. Thank you. I believe that I have three minutes. I forgot to say that at the beginning of the rebuttal. Yes. Your time is up. Now. It is up. I care about the osteoporosis. Ha, ha. That's more alarming. Well, I think we're at afternoon, so I'll say good afternoon to your honors. My name is Jack Winnick. I'm accompanied by Theodora McCormick from my law firm. And we represent Elaine Laves and Andrew Lane. I've allocated 11 minutes for my argument. And my colleague, Mr. Carbelli, has allocated four minutes on behalf of his client, Dr. William Lane. All right. And let me begin with the burden. Let's begin with Advocal. Yes, Your Honor. Isn't the FTC correct that your ads create an impression that Advocal is comparable or superior to prescription drugs for osteoporosis? I would say that they are incorrect. Really? We do not make that claim. The material cited in the record in support of that claim consists of an internal consultant's report that was never circulated. It consisted of an email to an overseas Lebanese distributor. And it consisted, in their mind, of an article that was third-party literature that was not written by my client. Did you tell, did you communicate that to HSI? It was HSI who stated that, right? HSI, Health Sciences Institute, I believe. Did your client make any effort to disassociate the claims in that article from its product? Or did he disseminate the newsletter? The client, Lane Labs, did disseminate that article. But they perpetuated the error, affirmatively, didn't they? No, I don't believe that we did perpetuate it. Because the article that you're referring to is only one small piece of all the advertising. I'm not asking context. I'm not asking just how it relatively compares to any other misrepresentation. I'm asking whether or not Lane affirmatively took the step of distributing to the public or to potential customers a newsletter bearing, containing the false claim that there was superiority over or equivalence with prescription drugs. Well, we did, Lane Labs did circulate that article. And you also emailed the distributor stating that Advocale had bone-building results on par with prescription pharmaceuticals. There was an email, I believe, to a Lebanese distributor that never resulted in any sales of the product. And that had nothing to do with consumers. Isn't it in direct violation of the consent order? I don't believe so, Judge. The first one, at least, was submitted as part of the February 2001 compliance report. That was going to be my next point. That newsletter was part of the February 2001 compliance report. It was also candidly posted on the Lane Labs, linked to the Lane Labs website, which the FTC also accessed in February 2001. So be it as it may, whether that was a smart thing to do and whether or not to circulate that article, fact remains is that the FTC had that material at its disposal. For over six years, we never received any warning letter. So what are we supposed to do? I know there was a lot of discussion about that. But have they waived their right to file for contempt if they find something that's in contempt? I mean, so what? I mean, we don't apply laches to a government agency. I mean, so what that they didn't do anything? They're busy. They have a lot of other things to do. And they don't have enough people. Let me address that in two ways. First of all, our position is not that this is a defense. It's a fact. The fact that they didn't. Well, it's a fact that you raised in defense of the, as an objection to the district court order. But it goes to, it goes, Judge, it goes to analyze our conduct. Not the FTC's conduct. And that's how Judge Kavanaugh. Yeah, but that's what you're claiming though. You're claiming that it's the FTC's conduct or lack of conduct. And by the way, it isn't six years. In four years, they asked you for more material to substantiate these claims. Isn't that right? No, there was no such demand. There was different compliance reports submitted in response to different letters. There was no letter about Advocale till the summer of 2006, I believe. So what? The fact of the matter is that this case, the FTC put themselves in this position. They could have filed a new complaint and proved this allegation by preponderance of the evidence. They didn't. They chose to file a motion for contempt about disobeying this consent order. The consent order, Judge, is. Yeah, but how does the fact, I'm still getting back to, how does the fact that they didn't act for six years in any way exculpate Lane Left? It exculpates us in two ways. It exculpates us in the sense that we were led to believe that our actions were okay. It goes to the reasonableness of our conduct for substantial compliance. This notion that the FTC. And in fact, the district court analyzed or invoked the whole notion of delay within the district court's opinion dealing with substantial compliance. Correct. And he talks about it not in judging the FTC's conduct, but in judging Lane Left's conduct. Should Lane Left have done something more? Was it reasonable for Lane Left to believe it had to do more? I just would like to add, though, the consent order, Judge, Your Honors, is a contract. And this should be on both sides a covenant of fair dealing, if you will, and reasonableness. And the FTC could have done like any other government agency does. You think that the government has to deal with fair deal? I don't understand this covenant of fair dealing. I mean, this is the government and a private entity. The government, what do you, where does that come from? It's a consent order. A consent order is judged by the law of contract. I think the court, the Third Circuit Harris stated that. And if you violated the consent order, what difference does it make that the government took a little more time to get after you for that? The difference is that it goes to the reasonableness of our conduct and our understanding on the issue of substantial compliance. How? How does it go to anything other than the government's conduct? The consent order, and please correct me if I'm wrong, the consent order, among other things, prohibited your client from using third-party publications and advertising and promotion in a way that would be false, deceptive, or misleading under Section 5. Didn't it, among other things, say that? It says that we shouldn't misrepresent the results of research and tests. So assuming the government delay, assuming the lengthy government delay that's been referred to here, how does that in any way impact on whether or not you violated that provision of the consent? It impacts whether we substantially complied with the order, whether our conduct was peaceful. It impacts whether or not you are in violation such that it should give rise to a determination of contempt, right? Yes. But it doesn't in any way obviate responsibility vis-à-vis the terms of the consent. Correct. But the consent order, I can get back to, is a contract between both sides. It's internal record. What's reasonable? And the government, this idea of lack of resources, I'll address that for a moment. In today's day and age, every government agency, SEC, the Department of Justice, when they enter into consent orders, they appoint monitors at company expense to monitor compliance with those consent orders. So they can't have it both ways. Was it their monitors or their monitors? There was no. They did not negotiate that term. Well, you said in every case they do that. No, I'm saying in many cases government agencies do that. They chose not to do that. They could have had us at company expense like the SEC or the Department of Justice or many other agencies do pay for our own monitor to monitor the compliance. Are you claiming that the findings are incorrect? For example, you agree, don't you, that the advertisement with respect to clinical tests was misleading? The one that says, quote, has been clinically shown to increase hip BMD, quote. Isn't that, if not blatantly misleading, isn't that an overrepresentation? I would characterize that, as I think the judge implicitly did, as a technical violation. Mr. Lane conceded there were no clinical studies, but they were ratback studies. There were animal studies, and there was also studies of You mean an animal's hip is the same as my hip? No, it's not. But we had that evidence, plus we had the evidence of other calcium products who have shown a positive effect on a hip. And we have expert testimony you could extrapolate from that research to the Advocale product. You've got two different things. You've got bone density and bone growth. I mean, they're two different things. They're two different subjects. BMD is density. Yeah. That's what the name is. You were talking about the density, as opposed to they were talking about growth. There was a representation as to the capacity of this product to enhance growth, wasn't there? There was a representation that Advocale can increase BMD or bone mineral density. There was no clinical support for that. There was no test of Advocale in the human hip. In the human hip. There was tests of Advocale in animals. In rats. Rats and beagles, I believe. Beagles? Beagles. Beagles. Beagles. Dogs. Oh, beagles. Beagles. Dogs. You're not a dog person, I know. We know you are. Other competing products that also showed a positive bone effect. I see I'm cutting on the end of my time. Let me just say, as far as the findings, the standard of review is not how thorough Judge Kavanaugh's opinion is. The standard of review is whether there was any plausible basis in the record to support what he did. And the reasonableness determination is a factual basis, a factual decision. And we're not just limited to the testimony, live testimony experts, but Judge Kavanaugh had deposition testimony and he had the scientific studies and all this other material. And the fact that his opinion could have been more elaborate is not the standard, Your Honor. Thank you for your time.  Yes, Your Honor. Of course. Should we, especially in view of the fact that your argument really implicates, greatly, the last portion of Judge Kavanaugh's opinion, which was the substantial compliance section, should this Court use this case as an exception to explicitly adopt a substantial compliance test? And if so, shouldn't we follow the Robin Woods lead? I think that there's some confusion as to whether the standard has been adopted or not in Harris v. City of Philadelphia. That's a different case. That was an impossibility issue that the city commonwealth raised in that case. It was not the same as here. There are several district courts that have cited that for the proposition that that is the standard for substantial compliance. Well, yeah, but Judge Smith said, should we issue an opinion? It's irrelevant whether the district courts, frankly, I don't know whether the lawyers realize it, but we realize it. It doesn't matter what the district courts say. I believe the Court should. I believe that most circuits recognize the defense and I believe there will be guidance to individuals and companies entering consent orders to have some guidance to notice that this defense is available to them. That's interesting. Thank you. Okay, thank you. I'd be interested to hear, oh, there's somebody else. Yeah, yeah. He's not going to have anything. Huh? He has the old father. 88 years old. Good afternoon. May it please the Court. My name is Paul Carvelli. I have a few minutes to argue on behalf of Dr. William Lane. But as much as I want to stand here and defend Dr. Lane, I also want to defend Judge Kavanaugh because there's been at least some discussion about what his opinion was and wasn't. And what I think we need to emphasize is that Judge Kavanaugh held a five-day hearing with 1,300 pages of transcript. He let the FTC put in every piece of evidence that it wanted to, including, as I recall, in characterizing their first witness as the worst hearsay witness in 35 years. Judge Kavanaugh had pre-hearing submissions and post-hearing submissions. And he actually said in his opinion at one point, the FTC presented a nuanced case in which it delved into the minutia of every bit of substantiation that Lane Labs offered. And what he found at the conclusion of all of the testimony from competing experts on both sides was that this was essentially a difference of opinion between experts. And to say, as the FTC does now, that Judge Kavanaugh ignored certain things, is not only to ignore what happened below, but also to ignore his opinion. If you look at page three of his opinion, he says very clearly, this is what this case is about and these are representative claims of what I have listened to. But he listened to all of the evidence. He questioned Andrew Lane specifically on the point that Your Honors raised about the use of the term clinical in one of the ads. And Andrew Lane said, that was a mistake. And Judge Kavanaugh in his opinion said, some things through the years slipped through the cracks and mistakes were made. But Judge Kavanaugh's role here was to determine whether or not these defendants should have been held in contempt. And he determined based upon all of the evidence, he was not satisfied that the government met the standard of proof. Which is clear and convincing and is very significant. So what this court is really compelled to do is to look to see if Judge Kavanaugh misapplied the law, and we contend that he did not. Or found facts that were clearly erroneous. And Your Honors, based upon the testimony, he made credibility determinations, which I think the case law in the circuit says, almost by definition cannot be clearly erroneous. He made credibility determinations about the competing expert witnesses he characterized it as a battle of experts at one point. And that in and of itself speaks volumes, I think, in terms of meeting the standard of clear and convincing evidence. The FTC had experts that simply disagreed with the quality of substantiation. But not, these ads were not unsubstantiated. And Judge Kavanaugh so found. He found that the defendants not only reasonably complied with the orders, but they had credible substantiation for the order, I'm sorry, for the ads. And that was their obligation. And so what we asked this court to do is to simply recognize its role, deferring to Judge Kavanaugh as it must, and recognizing that he had. Deferring to him on what? On what issue? On his very careful review of the evidence. On his findings of fact. Specifically in terms of substantiation. He dealt with each of the claims that. What are those specific findings other than the general determinations of credibility of the experts? And substantial compliance. And substantial compliance, if that's a finding of fact that I'm personally not certain of that. Well, Your Honor, to answer that question first, I think that is a legal conclusion at the end. But it's based upon a number of findings of fact. Judge Kavanaugh did not issue an opinion. Nor did he rule from the bench specific findings of fact as to each claim that the FTC challenged. If he did that, this would be hundreds, if not a thousand page opinion. The compliance reports, to give the court a sense, were thousands of pages. And there were thousands of pages of evidence. So I think it's a little bit unfair to expect of Judge Kavanaugh that he engage in findings of fact as to each specific claim. I don't think the law requires that. I think what the law requires Judge Kavanaugh to do is to accept the evidence. Assess the credibility of the witnesses. And determine whether or not contempt has occurred. This wasn't really a trial as much as it was a motion. And frankly, Your Honors, a motion based upon two years. Two and a half years, I think. Of discovery by the FTC. And one of the first questions the district court asked us is why is any discovery necessary? Okay. Thank you. Your red line has moved. Thank you, Your Honors. Okay. Ms. Arrington? Ms. Arrington, I would like you to answer the proposal that was, I guess, Judge Smith asked. Which whether, what's the FTC position as to whether we should adopt a substantial compliance standard? I think that adopting a substantial compliance as articulated or at least as applied in Robinwoods would be a helpful thing. It's so amorphous right now. And I think that one important thing to note about that standard is, and this is something that I believe the district court glossed over and certainly did apply, is that the burden is on the defendants. And this court, in other circumstances, has made that clear. Other courts have made it clear. The burden is on defendant to articulate a substantial compliance defense. And I think that that two-pronged standard is a good one. Didn't we do that in Robinwoods? In Robinwoods, the court applied it but didn't expressly adopt it. Said, well, assuming that's the standard. We recognize that some other courts cited to the Ninth Circuit decision have recognized Right. But I think the important thing to know is that that's not an easy standard to make. I mean, not an easy standard and not an easy defense to make. Well, you'll argue that they haven't. Yes. Correct. Yes. Obviously, if the FTC brings a contempt motion, then you're arguing that they haven't substantially Yes. Yes. Correct. But you both think that we should say that that is the standard. I think so. I mean, the defendants certainly frequently argue in the cases that defendants cited in our brief, substantial compliance is often argued. It's rarely found. And that's for a defendant to prove? Who has to prove? Correct. Well, obviously. The defendant. I mean, that's assuming that that comes up in the context of the plaintiff having met its initial burden of showing violations. And it's an excuse for violations. Yes, there were violations, but don't hold us liable and don't hold us responsible for that. So don't hold us in contempt. Contempt. Okay. And what is the standard by which we would judge or what any court would judge whether they should be held in contempt? Under a substantial compliance defense? No. No. Just what is the legal standard for contempt? Well, you have to look at what the order requires. Denial of contempt. Right. Denial of contempt. I mean, it's abuse of discretion. But in this case. I meant, what does the defendant have to have done to be in contempt? That depends on what the order requires. In this case, the. Disobeyed the order. Disobeyed the orders. And in this case, the order had an affirmative obligation in there that you are prohibited from making certain claims unless you come forward. Unless you possess at the time you are making those claims. Not come forward. Unless you possess. Unless you possess at the time you make those claims. Competent and reliable scientific evidence. And also that you not represent. You not contain representations that falsely characterize studies. Why did the FTC bring this action for contempt? Is Lane Labs continuing to make the representations that you argue were false? Yes, I believe so, Your Honor. I'm not sure what's happening at this moment. But there is no. They are taking the position that. And right now they have a district court opinion that gives a green light to these types of claims. And so as far as I know, they're continuing to make these claims in their advertising. But I do not know that for a fact certain. I have a question which I would like to ask. Dr. Haney testified that defendants claim that Advocal is effective as prescription drugs for preventing fractures is, quote, potentially dangerous. And Dr. Niedenberger testified that, quote, there might be harm from taking maca. When did you first learn that there were potential health risks from these products? Well, Your Honor, I don't think that the FTC approached and made that affirmative claim themselves. With regard to maca, I think that that came out in testimony for the first time. So that was the first time you learned of it? Yes, I believe so. In general, I think, in general, this, the claims and the claim for sanctions that damages, if you will, is for the economic harm, and particularly with regard to Advocal, for example, the harm to consumers that they're paying. Twenty-four million dollars. No, but go back to my question. You say that that came out in testimony for the first time? With regard to maca, I believe so. What about Dr. Haney and the prescription drugs for preventing fractures as potentially dangerous? Well, I think in general, the concern about, not necessarily even so much with regard to fractures, but with regard to making an equivalency to prescription drug claims, to the extent that that dissuades consumers who would benefit from medication, from instead spending their money on a calcium supplement, that there's inherently some risk there. That wasn't the basis for the Commission's claim for, you know. But if the Commission was not monitoring Lane Lab's conduct, and it never responded to the 2001 compliance report, I mean, if there was a concern that was maybe not the primary concern, if there was a potential health risk, perhaps they should have picked it up earlier by monitoring or by responding. I mean, I could speculate that if there had been some actual, if there had been some more compelling information before the Commission, that there were actual injuries, physical harm to consumers. So there wasn't compelling information before the, and Dr. Haney's testimony was presumably, and Dr. Niederberger probably an exaggeration in those respects? Yeah, I mean, it's a concern. I don't think that there was anything more compelling than that. But certainly the district court's focus on, and I'll just leave, since my time is way over, just leave with these thoughts. This was a, I think that portion of the district court's opinion where it focuses on, well, these generally, there was testimony that these were generally good products, and there was no, you know, and he glossed over the evidence that showed at least the risk of physical harm. His repetition in several instances, including in the substantial compliance section of his decision, that there was no evidence of physical harm, completely glosses over the fact that. Well, if there had been any evidence of physical harm, then I would think it would have been incumbent on the FTC to be in there very early, checking and advising. Presumably if there had been compelling evidence of that presented to the Commission and that the Commission was aware of, things might have proceeded differently. We care as consumers on this topic. So let me, I'm going to keep this going for a few minutes. As far as you know, is Advocal still on the market? As far as I know it is. Okay, and if you think that, or somebody on your behalf thinks that it's dangerous to advertise this as appropriate remedy for osteoporosis, and given what the figures are as to the number of women and some men who have osteoporosis, is there anything that would preclude the FTC from filing a complaint today to stop it? No, Your Honor, if it turns... Leave aside the contempt. Yes. Yeah. No, Your Honor, that would be an option for the FTC with regard to that particular claim. You're part of the FTC. Yes. So you could go back and tell them they should do it. I'm not sure that my recommendation carries the weight that I would like it to, but yes, that would be an option for the FTC. That this is something that concerns the Court. Yes. All right, Your Honor, if you have no further questions, I just want to respectfully request that you reverse the District Court in light of the undisputed evidence on the denial of contempt and remand for further proceedings on the issue of remedy.